

FILED

Apr 12 2018, 5:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffery M. Haupt
Law Office of Jeffery Haupt
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tevin Dejaron Winborn,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 12, 2018<br><br>Court of Appeals Case No.<br>71A03-1708-CR-1890<br><br>Appeal from the St. Joseph<br>Superior Court<br><br>The Honorable Elizabeth C.<br>Hurley, Judge<br><br>Trial Court Cause No.<br>71D08-1606-F5-125 |

**Mathias, Judge.**

[1]     Tevin Dejaron Winborn ("Winborn") appeals his convictions for Level 5 felony carrying a handgun without a license, Level 5 felony battery to a pregnant woman, and Level 6 felony strangulation. Specifically, Winborn appeals the trial court's denial of his motion to suppress the evidence obtained from

Tashala Berry's ("Berry") apartment, arguing that the search and seizure of his backpack violated his rights under the Fourth Amendment.[1] Winborn also argues that the evidence was insufficient to support his battery and strangulation convictions.[2]

[2] We affirm.

## Facts and Procedural History

[3] Winborn and Berry had been dating for approximately two and one-half years leading up to June 2016. Winborn regularly spent the night at Berry's apartment and occasionally left personal items there as well. For a time, Winborn had a key to Berry's apartment, but she took it back from him in May 2016. The two had a tumultuous relationship, and there were several holes in the walls of Berry's apartment caused by both her and Winborn.

[4] On June 9, 2016, Berry found out that she was pregnant with Winborn's child and told him. On the evening of June 20, Berry and Winborn got into a heated argument in an unidentified person's apartment where Winborn allegedly choked Berry and slammed her to the kitchen floor.[3] The two went back to Berry's apartment that evening, and Winborn stayed the night. At some point

---

[1] Winborn does not challenge the search under Article 1, Section 11 of the Indiana Constitution.

[2] We held oral argument in this case at Cathedral High School in Indianapolis, Indiana on March 20, 2018. We thank the faculty, staff, and students for their gracious hospitality. We also thank counsel for their excellent written and oral advocacy.

[3] It is unclear where this altercation took place. Berry did not remember where it was; she simply stated that "[i]t was in somebody else's apartment." Tr. Vol. 2, p. 152.

the next morning or early afternoon, the two got into a second argument in which Berry and Winborn both exchanged blows, and the two fell on to Berry's bed where Winborn choked her again. Berry testified that Winborn used one hand when choking her and he did so with enough force to cause her to stop breathing. Tr. Vol. 2, p. 151. Throughout their confrontations, Berry explained, "I am swinging on him. I am punching him. But he is smacking me and choking me." *Id.* at 173.

[5] During the scuffle on June 21, Berry's phone broke, and she then left the apartment and walked to her aunt's house which was nearby. At her aunt's, Berry called 911. South Bend Police Department Officers Dertz and Teague arrived on scene soon after. Berry relayed what happened, and she indicated that Winborn was still in her apartment.

[6] Officer Teague testified that he asked Berry if the officers had permission to enter the apartment, and that "[s]he actually said yes and left us keys to her apartment at that time." *Id.* at 11.[4] Prior to approaching the apartment, Officer Dertz looked Winborn up in the "cadis" program, "and it confirmed that he did have a prior conviction for -- I think it was just a handgun without a license at the time." *Id.* at 38–39.

---

[4] Berry testified that she did *not* give officers consent to search her apartment. *See* Tr. Vol. 2, pp. 171–72, 185. However, it is clear that the trial court credited the officer's version of events regarding Berry's consent as it stated in its order, "Berry gave consent to the officers to search the home." Appellant's App. p. 193.

[7] The officers then approached Berry's apartment and were able to have a brief conversation with Winborn at the front door. Winborn thought the officers were there to serve a warrant for a different offense, and when he realized this was not the case, he invited the officers inside to discuss the altercation with Berry. Soon after, Officer Teague brought Winborn out to his squad car, placed him in the back, and advised him of his *Miranda* rights.

[8] In the squad car, Winborn provided a recorded version of what took place with Berry. During the conversation, Winborn mentioned to Officer Teague that he had a backpack inside Berry's apartment and that the backpack might contain a firearm. Winborn also explained that he thought the gun may be Berry's. Officer Dertz was not privy to any of this information prior to entering the apartment.

[9] While Winborn was in the squad car with Officer Teague, Officer Dertz went inside Berry's apartment. Inside Berry's bedroom, Officer Dertz noticed a black Nike backpack in the closet. The closet door was open, but the bag was zipped closed. Officer Dertz testified that the bag caught his eye "because the closet was full of women's clothes." *Id.* at 43. He also testified that when he saw the bag, he assumed it belonged to Winborn. *Id.* at 61.

[10] Officer Dertz proceeded to bend down and pat the bag, and he felt a hard object in the front pouch which he believed was a gun. He unzipped the bag and found

a fully loaded .38 revolver.[5] Winborn acknowledged that it was his bag when Officer Dertz carried it out of Berry's apartment.

[11] Winborn was arrested and charged with Level 5 felony carrying a handgun without a license,[6] Level 5 felony battery to a pregnant woman, Level 6 felony strangulation, and Class A misdemeanor carrying a handgun without a license. Prior to trial, Winborn filed a motion to suppress the gun recovered from the apartment under both the Fourth Amendment and Article 1, Section 11. A three-day bench trial commenced on May 22, 2017, and the court decided to wait until the end of trial to rule on the motion to suppress.

[12] At the conclusion of trial, the court denied Winborn's motion to suppress and found him guilty as charged. On August 8, the court sentenced Winborn to two years for strangulation, five years for battery resulting in bodily injury to a pregnant woman, and five years for felony carrying a handgun without a license, all to run concurrently. The court did not enter judgment on the Class A misdemeanor carrying a handgun without a license.

[13] Winborn now appeals.

---

[5] Incredibly, the gun also had the hammer cocked, and Officer Dertz testified that he considered himself lucky that when he "reached down and patted it that it didn't fire." Tr. Vol. 2, p. 46. In addition, the firearm was stolen. *Id.* at 29, 49.

[6] This is a Level 5 felony because Winborn had a prior conviction for carrying a firearm without a license. *See* I.C. § 35-47-2-1(e)(2)(A)(i).

# Inevitable Discovery

[14] Winborn argues that the trial court erred in denying his motion to suppress because the warrantless search and seizure of his backpack violated his rights under the Fourth Amendment. However, we do not reach the substance of his Fourth Amendment claim because we find it dispositive that under the unique facts and circumstances before us here, the backpack and firearm would have been inevitably discovered regardless of any constitutional violation.

[15] To encourage police officers' compliance with the Fourth Amendment, "evidence seized in violation of the Constitution must be excluded at trial unless an exception to this 'exclusionary rule' applies." *Shotts v. State*, 925 N.E.2d 719, 723 (Ind. 2010). One exception to the exclusionary rule is the inevitable discovery exception which "permits the introduction of evidence that eventually would have been located had there been no error." *Gyamfi v. State*, 15 N.E.3d 1131, 1137 (Ind. Ct. App. 2014) (citation and quotation omitted).

[16] Winborn contends that "whether or not [the] challenged evidence would have been properly obtained inevitably is too speculative." Appellant's Br. at 18. This is because "discussions of the backpack came up with Winborn only after Officer Dertz had found the bag and examined the contents." *Id.* We disagree.

[17] Contemporaneous to the time that Officer Dertz was searching in the house, a Mirandized Winborn was telling Officer Teague in the back seat of the squad car that he had a backpack in the house and that there might be a gun in that backpack. Tr. Vol. 2, pp. 26–27, 31. Although perhaps stretched by other

applications in other cases, this is a perfect example of the rationale behind the inevitable discovery rule.

[18] In addition, whether or not officers found the backpack and firearm, Winborn was going to be removed from the property based on the alleged strangulation and battery. In such an event, Officer Dertz testified that the individual is allowed to gather their personal belongings. *Id.* at 55. Prior to leaving the scene, Winborn would have identified the backpack as his, and because Winborn was still going to be arrested for the alleged battery and strangulation, officers would have discovered the gun during processing "to make sure there wasn't anything illegal or anything that shouldn't go to jail with [him]." *Id.* at 56. Thus, under the Fourth Amendment, the gun would have been admissible because it would have been located eventually, even if we assume the officer's search and seizure of Winborn's backpack was improper. *See Nix v. Williams*, 467 U.S. 431, 444 (1984).

[19] Because the gun would have been admissible at trial under the inevitable discovery exception to the exclusionary rule, the trial court did not abuse its discretion when it denied Winborn's motion to suppress.

## Sufficiency of the Evidence

[20] When reviewing a claim of insufficient evidence to sustain a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Jackson v. State*, 50 N.E.3d 767, 770 (Ind. 2016). It is the fact-finder's role, not ours, to assess witness credibility and weigh the evidence to determine

whether it is sufficient to support a conviction. *Id.* We will affirm the conviction unless no reasonable fact-finder could have found the elements of the crime proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007).

[21] At the time of Winborn's Level 6 felony strangulation conviction, the State had to show that he: (1) knowingly or intentionally; (2) in a rude, angry, or insolent manner; (3) applied pressure to Berry's throat or neck; (4) in a way that impeded Berry's normal breathing or blood circulation. Ind. Code § 35-42-2-9(b). And to convict Winborn of Level 5 felony battery of a pregnant woman, the State had to show that he: (1) knowing or intentionally; (2) touched Berry; (3) a pregnant woman; (4) in a rude, insolent, or angry manner; (5) resulting in bodily injury to Berry; and (6) Winborn knew Berry was pregnant at the time. Ind. Code § 35-42-2-1(c)(1) & (g)(3). Winborn argues that there was insufficient evidence to support the conclusion that he touched Berry in a rude, insolent, or angry manner.[7] We disagree.

---

[7] We note that Winborn did not challenge the sufficiency of the evidence supporting his conviction for Level 5 felony carrying a handgun without a license. While we may raise this issue *sua sponte*, *see Miller v. State*, 616 N.E.2d 750, 751 (Ind. Ct. App. 1993), we decline to do so. However, because this issue was raised during oral argument, we briefly address it here. Carrying a handgun without a license may be proven by constructive possession, which required the State to prove that Winborn had "both the intent and the capability to maintain dominion and control over the [handgun]." *Bradshaw v. State*, 818 N.E.2d 59, 62–63 (Ind. Ct. App. 2004). Here, the gun was mingled in with other items owned by Winborn including his clothing. See *id.* at 63 (explaining that the comingling of a firearm with items owned by the defendant can prove constructive possession). Winborn himself testified that he brought a backpack to Berry's on June 20.

[22]    Berry testified that Winborn choked her and struck her in the face on both June 20 and June 21. Tr. Vol. 2, p. 173–74. Berry also testified that on June 21, Winborn choked her with enough force that she stopped breathing for "a couple of seconds." *Id.* at 151. Moreover, the emergency room doctor who examined Berry stated that Berry informed him that she had been "struck and choked" and that she exhibited "some redness to her neck on the left side." *Id.* 88–89. Winborn bases his argument on the fact that Berry's aunt, both responding officers, and the paramedic on scene did not notice any visible injuries on Berry. However, this is nothing more than a request for us to weigh the evidence differently than the trial court, which we cannot do.[8]

---

Tr. Vol. 3, p. 17–18. Officer Teague testified that Winborn told him that he had clothing in the backpack. Tr. Vol. 2, pp. 26–27. And the gun was found in his backpack. In light of this evidence, we conclude that there is probative evidence from which the trial court could conclude that Winborn constructively possessed the gun. And even if we found the evidence insufficient to support the conviction for Level 5 felony carrying a handgun without a license, Winborn's sentence would not be affected because that five-year sentence runs concurrently with his five-year sentence for Level 5 felony battery of a pregnant woman.

[8] We disagree with Winborn's argument that we should apply the incredible dubiosity rule and find Berry's "testimony regarding him strangling her and smacking her so inherently improbable that it is not sufficient to sustain his convictions for strangulation and battery." Appellant's Br. at 20. Our supreme court has explained that the incredible dubiosity rule "is limited to cases where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion *and* there is a complete lack of circumstantial evidence of defendant's guilt." *Majors v. State*, 748 N.E.2d 365, 367 (Ind. 2001) (emphasis in original) (citation omitted). Here, it is clear that Berry's testimony is consistent with what she told her aunt, the responding officers, a responding paramedic, and the emergency room doctor—that she had been struck and choked by Winborn. Moreover, Berry's apartment showed signs of an altercation as it was in disarray and there were several holes in the walls. Berry's testimony was not contradictory, and there was plenty of circumstantial evidence to support Winborn's convictions. Simply put, this case does not present an example for application of the incredible dubiosity rule.

# Conclusion

Based on the unique facts and circumstances before us, the trial court did not abuse its discretion when it denied Winborn's motion to suppress because the inevitable discovery exception to the exclusionary rule applies, and therefore, the firearm was admissible at trial. We also find that there was sufficient evidence presented to convict Winborn of strangulation and battery of a pregnant woman. Accordingly, we affirm.

Baker, J., and Kirsch, J., concur.